SALLIE PETTIT, Administrator, v. ATLANTIC COAST LINE
RAILROAD COMPANY.

(Filed 4 October, 1911.)

1. **Employment of Children—To What Confined—Interpretation of Statutes.**

    The provisions of Revisal, sec. 1981a, "that . . no child under twelve years of age shall be employed in any factory or manufacturing establishment in this State," are not interpreted so as to extend the employment of such child to include employments not within its letter or spirit.

2. **Railroads—Master and Servant—Messenger Boys—Employment of Children—Dangerous Employment—Negligence—Causal Connection—Evidence.**

    The plaintiff's intestate was a boy under twelve years of age, employed by the defendant railroad company as a messenger boy, with the duties of carrying dispatches and messages from and between its certain officers, necessitating his going over defendant's yard where there were numerous tracks whereon the trains continuously were passing, in the course of his employment: *Held*, evidence only that the intestate was last seen before the injury riding on the corner of defendant's box car, and that he was found thereafter lying on defendant's track in the injured condition which within a few hours caused his death, is insufficient to take the case to the jury upon the question of defendant's negligence, and a motion to nonsuit was properly sustained.

3. **Railroads—Master and Servant—Employment of Children—Dangerous Duties—Instructions to Servant—Scope of Employment —Evidence.**

    In an action to recover damages of defendant for its negligent killing of plaintiff's intestate, a boy under twelve years of age, employed to carry dispatches or messages across defendant's numerous tracks, where trains were continuously passing and repassing, the question as to whether the defendant had instructed the intestate as to the dangerous character of his employment becomes immaterial when there is no evidence tending to show that the intestate was engaged in his duties to the defendant under the scope of his employment at the time in question or that the injury occurred by reason thereof, the burden of showing which was upon the plaintiff.

APPEAL from *Whedbee, J.,* at June Special Term, 1911, of EDGECOMBE.

This is an action brought by the administratrix of Joe Pettit, to recover damages.

The complaint alleges the death of the intestate, his employment by the defendant as a messenger boy, the nature of his duties, a description of the place where he had to work, and then alleges specifically the acts of negligence complained of as follows:

"On 28 April, 1907, the said infant was given a message by the defendant, and carelessly and negligently directed by the defendant to deliver the same to another one of its employees, and to do so required the infant to go somewhere on the yard to track No. 9 or 10. About this time an engine with a number of cars of defendant, going south, passed, when the said infant undertook to go upon said slowly moving train to the point where the message was to be delivered. He stood upon the iron steps of a flat car in the said train, and suddenly the said car upon which he was standing, failing to clear another car standing on a track of the defendant, said infant was knocked from his position by coming in contact with the said car on the adjoining track; he was thrown between the wheels of the moving train and was so badly injured that he died the same afternoon."

The following evidence was introduced by the plaintiff:

Mrs. J. W. Spiers, formerly Mrs. Sallie Pettit, testified as follows:

Q. Your name is Mrs. J. W. Spiers? A. Yes.

Q. You are the mother of the young man, Joe Pettit, that was killed at South Rocky Mount? A. Yes.

Q. When were you married the last time? A. Last December, three years ago.

Q. At the time of your son's death you were Sallie Pettit? A. Yes, sir.

Q. You have a record of the date of the birth of your son Joe? A. Yes, sir.

Q. Will you please open this Bible and turn to the page in question; is this a memorandum as to the date of the birth of your son Joe? A. Yes.

Q. And that record is that he was born on the 22d of June, 1895 or 1896? A. I can't tell.

Q. Do you remember the date? A. No, sir.

Q. Do you know who made this record? A. Yes.

Q. Who? A. Next to my oldest daughter. For about four years it was my brother's Bible, and I had her draw mine off from his. He had the old record of all his children and mine.

Q. The date was recorded in your brother's Bible? A. Yes.

Q. And these dates were recorded at the time of the birth of the children? A. Yes.

Q. Do you know of your own knowledge how old he was? A. Yes; he was eleven years old; would have been twelve in June, 1907.

Q. Did you ever give your consent that this boy should go to that company to engage in this work? A. No.

Q. How was the boy dressed with reference to long or short pants? A. Short, knee pants.

Q. What number of clothes did he wear, with reference to pants? A. No. 12; No. 11 all the time before.

Q. Was he large or small for his age? A. He was not large at all; just ordinary size.

Q. About what time in the day was he killed? A. Somewhere about 12; I was sitting at the dinner table.

Q. How long after that before your child died? A. I think it was somewhere about 4 that same afternoon.

Cross-examination:

Q. When was the first time, Mrs. Spiers, that you heard that your boy was working for the railroad? A. When he got his job he told me.

Q. How long before this accident did he tell you he had a job? A. He told me as soon as he got his job.

Q. See if you can't remember how long before his accident? A. At the last time he had been at work for a week.

Q. How long the first time? A. About two months.

Q. It is alleged that he had been in the employment about four days? A. Well, somewhere about a week; the last time I think it was on a Tuesday he began, and was killed Sunday.

Q. But, before he had been working about two months? A. Somewhere about that time.

Q. When he went there the second time did you tell him not to take it? A. No, sir; I don't think I did, but he said, "I am going back and take my same job, and—"

Q. Did you say not to do it? A. I don't remember what I said to him.

Q. The first time, did you tell him not to take it? A. I don't know, sir.

Redirect examination:

Q. Did you know just what duties he had? A. He told me he was a messenger boy; but I didn't know anything about it.

Q. Did you know anything about the danger attached to the job? A. No, sir. I had never been on the yard and I didn't know anything about it.

Q. Did you know how many tracks or trains there were there? A. No.

Q. Mrs. Pettit, how many other children have you? I have seven besides him.

Recross-examination:

Q. He told you he took messages from one office to the other? A. Yes.

Q. Brought his money home? A. Yes, to me.

Mr. J. W. Spiers testified as follows:

Q. Mr. Spiers, you are the husband of the lady who left the stand? A. Yes.

Q. Mr. Spiers, you have been in the employment, off and on, of the railroad at Rocky Mount? A. Yes.

Q. You knew the condition of the yard at South Rocky Mount in April, 1907? A. Yes, sir.

Q. Do you happen to know what duties Joe Pettit was discharging at the time of his employment? A. Messenger boy.

Q. In the office of Mr. E. S. Dodge? A. Yes, chief train dispatcher.

Q. And where were most of the messages to be carried?
A. To the yardmaster's office; his office was placed diagonally
across from the dispatcher's at that time.

Q. And over how many tracks did he have to go? A. At
that time he had to cross somewhere between eight or ten
tracks; I don't exactly know at that time.

Q. The yard has been torn up and removed and these tracks
have been torn up? A. Yes.

Q. Over these ten or twelve tracks between Dodge's office
and the other office how many trains moved and how often?
A. I can't tell; there was continuous shifting all the time. All
the yard engines from the roundhouse had to be delivered there.

Q. When the trains come in were not all trains handled over
these tracks? A. Norfolk and Charleston passenger trains
were.

Q. What about the making up of these trains? A. Well,
they were made up in the south yard and were left down in
south yard; they had to go over these tracks; all trains leading
north.

Q. What became of the cars going north? A. They passed
through the same tracks; they were made up in the northern
end of the yard and passed over the main-line track.

Q. To what extent were these tracks being used? A. For
classifying freight, loading and shipping freight, etc.

Q. How often? A. Continuously.

Q. What did you say Joe's duties were? A. Messenger boy.

Q. Took messages from the dispatcher's office to the yard-
master? A. Yes.

Mr. J. R. Pettit testified as follows:

Q. Look at that; do you remember that? A. Yes.

Q. Speaking with reference to that, that is what year?
A. 1907.

Q. A wire that your brother has been hurt? A. Yes.

Q. You were living here at that time? A. No, sir; I was
living at Rocky Mount, but I was over here that day.

Q. Did you know what your brother's duties were? A. Mes-
senger boy to carry messages to any office he was sent.

Q. Court: Were there any other duties? A. He was supposed to deliver messages to Mr. Robinson, Mr. Trueblood, and other offices on the yard.

Q. Just locate where these offices were and how many trains and tracks there were? A. Mr. Gorham's office was in the end of the principal shed and there were twelve tracks, I think, or more there at that time, and he had to cross these tracks to his office. Mr. Trueblood's office was across these tracks over between Mr. Gorham's office and the shop.

Q. What about the tracks there? A. He had to cross these same tracks. There was continued shifting and making up trains all the time during the day.

Q. What about Mr. Robinson's office? A. Robinson's office was back of the shop.

Q. How many tracks would he have to cross going to Robinson's office from the dispatcher's office? A. About fifteen or sixteen; it was behind the shop.

Q. Where was the office of the chief train dispatcher, Mr. Dodge, with reference to the main tracks of the A. C. L.? A. It was above the Coast Line restaurant.

Q. How far away from the main-line tracks? A. I don't really know exactly.

Q. As far as what? A. It was the distance of this building, or may have been more.

Q. About fifty feet? A. I suppose it was fifty feet or more.

Q. These tracks were in front of Dodge's office? A. Yes.

Q. How many of these tracks were there? A. There were only two main-line tracks and other tracks leading to them.

Q. How many of these? A. A good many of them; I don't remember how many.

Q. How many trains and shifting engines and engines and cars passed over these tracks? A. There was continuous shifting by trains for different points, Richmond, Florence, and Norfolk, over these tracks.

Q. Mr. Pettit, do you happen to know what your brother was receiving? A. $12.50 per month.

Cross-examination:

Q. Mr. Pettit, you have spoken of his duties and the messages to take to the offices; how would he proceed to carry it there?  A. Well, I suppose he would walk.

Q. Don't you know it was his business to walk from the point?  A. Yes, I suppose that was the point of it.

Q. That was his business?  A. Yes; that was part of it.

Q. Now, was there anything in his duty that required him to undertake to go upon a slowly moving train to the point where the message was to be delivered and ride upon iron steps of a freight car?  A. I don't know.

Q. So when he attempted to ride a slowly moving train he did that because he wanted to?  A. He did as all the others did.

· Q. Didn't he do that because he wanted to?  Yes, sir; and not only him, but all the others that age; there were more than him.

Redirect examination:

Q. There were other young children employed around the shop?  A. Yes.

Q. The dispatches this boy had to deliver were telegrams?. A. Yes.

Recross-examination:

Q. There were orders as well as telegrams?  A. Any messages he might be given from the dispatcher's office.

Q. He would take any message?  A. Yes.

Mr. Batts testified as follows:

Q. What is your name?  A. J. W. Batts.

Q. Where do you reside?  A. South Rocky Mount.

Q. What is your employment?  A. Train engineer.  I was fireman at the time of this accident.

Q. Fireman in April, 1907?  A. Yes.

Q. In whose service?  A. Atlantic Coast Line.

Q. Where were you on the day that Joe Pettit was killed? A. I was on the yard; had been out at work and just started home.

Q. At what time?  A. Between 11 and 12.

Q. Did you see Joe Pettit that day? A. Once; I saw him on the corner of the car.

Q. State what position he occupied on the car? A. He was standing on the steps and holding to the lower round.

Q. What kind of a car? A. Box car.

Q. In motion? A. Yes, moving.

Q. In what direction was it moving and where was the engine? A. At the southern end, the car was moving north.

Q. Did you see Pettit again this day? A. Yes, after he was run over.

Q. What attracted your attention? A. I heard some one scream out.

Q. Where did you find Pettit? A. He was lying on the track.

Q. What was his condition? A. One leg off.

Q. Do you know to what extent the tracks are used for the making up of trains and the classification of cars of the Coast Line? A. Yes.

Q. What was it; go ahead and state to the jury for what purpose they were used? A. They were put there for incoming trains and for making up trains going out.

Q. How frequently are engines and trains passing back and forth through the yard? A. Most all the time.

Mr. K. S. Lancaster testified as follows:

Q. Mr. Lancaster, do you know the condition of the yard of South Rocky Mount in April, 1907? A. I think so.

Q. Go ahead and tell the jury; describe it? A. Well, there was trains continually over the tracks; it was going and coming all the time; hardly ever more than two or three minutes without trains going backwards and forwards; about fifteen tracks there at that time.

Q. You were in the employment of the Coast Line at that time? A. Yes.

Q. Your duties called you upon the yard? A. Yes.

The plaintiff rested. The defendant moved for judgment of nonsuit; motion allowed, and plaintiff excepted.

The court signed the judgment of nonsuit as set out in the record, to which plaintiff excepted and in open court appealed to the Supreme Court.

The plaintiff contends that the employment of the intestate, a child between eleven and twelve years of age, was so dangerous that it alone was evidence of negligence, and that he was killed in the performance of his duty.

The defendant contends: (1) That there is no evidence of negligence. (2) That if the employment of the intestate is evidence of negligence, there is no evidence that the intestate was on duty when killed, and therefore the negligence of the defendant was not the real cause of death.

*H. A. Gilliam and Aycock & Winston for plaintiff.*
*F. S. Spruill for defendant.*

ALLEN, J., after stating the case: The question presented by the record has, within a few years, been considered by this Court in six cases: *Ward v. Odell,* 126 N. C., 948; *Fitzgerald v. Furniture Co.,* 131 N. C., 645; *Hendrix v. Cotton Mills,* 138 N. C., 170; *Rolin v. Tobacco Co.,* 141 N. C., 310; *Leathers v. Tobacco Co.,* 144 N. C., 342, and *Starnes v. Manufacturing Co.,* 147 N. C., 563.

The last three were against manufacturing establishments, and were based on the statute (ch. 473, Laws 1903, now Rev., sec. 1981a), which provides: "That from and after 1 January, 1908, no child under twelve years of age shall be employed in any factory or manufacturing establishment in this State"; and we deduce therefrom the following principles:

(1) That the statute is constitutional.

(2) That it applies to employment in factories and manufacturing establishments, and to no other.

(3) That the employment of a child under twelve years of age in a factory or manufacturing establishment is negligence *per se.*

(4) That such negligence is proximate, if the child is injured as the result of his employment.

(5) That there is no assumption of risk by the child.

(6) That the negligence of the parent, if any, in permitting the employment, cannot be imputed to the child.

(7) That in addition to the usual presumption against contributory negligence, there is a presumption that the child has not the capacity to appreciate the dangers of his employment.

(8) That this presumption may be rebutted.

These decisions are not, however, authoritative in this case, because the employment of the intestate is not within the statute, and is not forbidden by it, and we are not at liberty to extend the statute to include employments not within its letter or spirit.

In the *Hendrix case,* the boy was employed to work at the complicated machinery of a cotton mill, but as he was twelve years of age, the case was decided on the principles of common law, and not on the statute, and it was held that there was a failure of proof as to negligence and proximate cause.

In the *Odell* and *Fitzgerald cases* there was evidence of the negligence of the employer, outside of the dangerous character of the employment, in that in each there was evidence of a failure to instruct the child, and in both the question discussed was the correctness of instructions on contributory negligence.

The opinion in the *Fitzgerald case* was written by *Chief Justice Clark.* He quotes with approval the following language from Thompson on Negligence: "The law puts upon a master, when he takes an infant into his service, the duty of explaining to him fully the hazards and dangers connected with the business, and of instructing him how to avoid them. Nor is this all; the master will not have discharged his duty in this regard unless the instructions and precautions given are so graduated to the youth, ignorance, and inexperience of the servant as to make him fully aware of the danger to him, and to place him, with reference to it, in substantially the same state as if he were an adult."

He also refers to the statutes from many of the States, and from Europe, giving the ages at which children may be worked in factories, and concludes: "With this consensus of opinion in nearly the entire civilized world, it might be that it would not have been error if the judge had held that it was negli-

gence *per se* to put a child of the tender age of nine years to work on a dangerous machine which he had never seen before, without any instructions or warning, and to leave him there by himself without stopping the machine. But, however that may be, it certainly was not error to leave the question of negligence to the jury with the charge given in connection therewith, which was very favorable to the defendant."

Accepting this as a correct statement of the law, we must abide by it, and can permit a recovery of damages for no reason except that a child has been injured. We may have pity and may be inclined to heed "the sob of the child in its helplessness," but we must accept the law, as we understand it, as our guide in determining the rights of litigants, bearing in mind the admonition of *Judge Daniel:* "The courts should not be wiser than the law."

The question is not presented in this record, and therefore it is not necessary to decide it; but we might go further than the *Fitzgerald case,* and hold that when the employment is dangerous, it is not necessary to prove a failure upon the part of the employer to instruct, and still there would be no evidence of actionable negligence in this case, because there is nothing in the evidence to show that the intestate was on duty, or was performing a duty for the defendant. The evidence is vague and unsatisfactory. No witness swears on what day the intestate was killed, but we assume it was on a Sunday in April, 1907. No one swears he was killed by a train of the defendant, but we accept this as proven, although it would have been easy to show signs of blood on the rails or track, which was not done. The only statement as to how the intestate was injured is contained in the answer of the defendant, which was not in evidence: "That the said Joe Pettit at the time he received the injuries alleged in the complaint was rendering no service to the defendant, and was where he had no right to be. That said Pettit, of his own will and accord, and against the warning of his companions, attempted to get on a passing flat car, missed his catch, fell, and the wheel of the car passed over and mashed his feet, without any fault of the defendant."

156—9

No witness says that the intestate was on duty the day he was killed, or that he was performing a duty for the defendant at the time of his death.

These facts were not peculiarly within the knowledge of the defendant, as his mother and stepfather knew whether or not he was on duty that day. Both knew he was employed by the defendant, and the mother received his wages.

The evidence, accepting it as true, shows that he was a messenger boy to carry messages, and that he had to cross the tracks; but there is no suggestion that he had to ride passing freight trains to perform these duties.

We repeat here the evidence of the witness Batts, who is the only witness who testifies to any fact connected with the killing:

Q. What is your name? A. J. W. Batts.

Q. Where do you reside? A. South Rocky Mount.

Q. What is your employment? A. Train engineer. I was fireman at the time of this accident.

Q. Fireman in April, 1907? A. Yes.

Q. In whose service? A. Atlantic Coast Line.

Q. Where were you on the day that Joe Pettit was killed? A. I was on the yard; had been out at work and just started home.

Q. At what time? A. Between 11 and 12.

Q. Did you see Joe Pettit that day? A. Once; I saw him on the corner of the car.

Q. State what position he occupied on the car? A. He was standing on the steps and holding to the lower round.

Q. What kind of a car? A. Box car.

Q. In motion? A. Yes, moving.

Q. Did you see Pettit again this day? A. Yes, after he was run over.

Q. What attracted your attention? A. I heard some one scream out.

Q. Where did you find Pettit? A. He was lying on the track.

Q. What was his condition? A. One leg off.

Q. Do you know to what extent the tracks are used for the making up of trains and the classification of cars of the Coast Line? A. Yes.

Q. What was it; go ahead and state to the jury for what purpose they were used? A. They were put there for incoming trains and for making up trains going out.

Q. How frequently are engines and trains passing back and forth through the yard? A. Most all the time.

The clear inference from this evidence is that the intestate, acting outside of the line of duty, jumped on a passing train, fell off, and was injured.

If we confined the plaintiff strictly to the allegations of the complaint, the case would be stronger against her, as no one could urge that there is any evidence that the intestate was knocked off the car by coming in contact with a car on another track.

The plaintiff was not inadvertent to the necessity of proving that the intestate was on duty, because he alleges that the intestate was in the discharge of his duty, and was engaged in delivering a telegram, but he offered no evidence to sustain these allegations.

After a careful consideration of the case, we conclude that his Honor committed no error in ordering a nonsuit.

No error.

WALKER, J., concurring: I concur fully in the opinion of the Court, as delivered by *Justice Allen,* and it has had my unhesitating assent from the beginning. He has stated the facts of the case, as I understand them, with such literal excerpts from the testimony as were necessary to show the exact situation when the boy was injured. It may, under certain circumstances, be negligent to employ, in a dangerous occupation, a boy of tender years, and without sufficient experience and intelligence to understand and avoid the danger; but, however this may be, the question is not even remotely involved in this case, and the decision proceeds upon the facts of the case, as disclosed by the undisputed evidence, and not upon any hypothetical matter. The youth of the child and the danger must,

in any possible view of the question of negligence, have been, not only the cause, but the proximate cause of the injury, and there is nothing in this record that, in my judgment, tends to present any such case. The boy was riding on the stirrup of the moving car for his own amusement and diversion, and not in the discharge of any duty as messenger, or in the course of his employment as such. Not only this, but it appears that his companions and playmates, who were of his own age, warned him not to ride on the car; so that he was not too young to be unaware of the danger, even if he had been in the line of his employment, and, in the absence of a statute making it unlawful to employ a boy of his age in such business, it would have been a question for the jury to determine, upon the evidence, the degree of his intelligence and his capacity to know and understand the risk, even if the question of negligence had been in any way involved in the case. It is clear that the mere fact of his employment, coupled with his youth, does not show actionable negligence, even though the extreme view of the law be adopted, unless the injury can be referred to those facts as its proximate cause; and this, we see, cannot be done. He was not carrying a message, but playing, and the company is no more liable for his injury than if he had been hurt while engaged in any other sport or pastime. His being under age is, therefore, an irrelevant matter, as it did not cause the injury. This is a case where there has been a loss without an injury (*damnum absque injuria*). The railway company is no more liable to the plaintiff than if the boy had not been in its employ, but was injured while engaged in some sport or play, such as shinney or baseball. There is an entire lack of cause and effect. If a man or boy is hurt, he is not entitled to recover, even of a railway company, because he was employed by it, unless the injury was brought about by some neglect of duty to him on the part of the company. The latter must have owed him a duty and failed to perform it, thereby causing the injury. But there is no such case here, and none that bears any resemblance to it. The boy was hurt by accident resulting from his own daring, for which the railway company is in no way responsible. We sympathize with the

plaintiff, but in deciding his case we must not be influenced by our feelings. It is not a matter of sentiment, but a question of law to be solved by the consideration alone of the cold and unyielding facts of the case. It is the safe and only rule, when making a decision, never to lose sight of the facts, but to keep them steadily and constantly before us, for whatever is outside of the facts is also outside of the law of the case, which consequently becomes a mere abstraction.

BROWN, J. I concur fully in the opinion of the Court written by *Mr. Justice Allen.*

As he has clearly demonstrated, I think the question as to whether the defendant company had the right to employ a boy of eleven and a half years of age as a messenger in its telegraph dispatcher's office at South Rocky Mount is not presented in this case. I do not think the Court should pass on matters not necessary to a decision of a case. When courts go further than this, their expression of views are regarded as not authoritative, and mere *obiter dicta.*

The matter of the employment of child labor in certain vocations is very largely a matter for the wisdom of the General Assembly and not for the courts. I think we should be careful not to enter the domain of the lawmaking power.

The matter of child labor has been discussed at several sessions of the Legislature, and so far it has not interfered, except in the case of manufacturing establishments.

There is no legislative restriction upon the employment of boys even under twelve years as messengers in telegraph offices, whether such offices are operated by railways or other corporations. Such employment is very general.

CLARK, C. J., dissenting: The plaintiff was not accorded the privilege of a jury trial to determine the facts. Therefore the evidence must be taken in the most favorable aspect for him and in the light of the most favorable inferences which could have been drawn therefrom by the jury. His intestate was a child, small for his age, which was under twelve, and had not taken off knee pants. He was employed at South Rocky Mount to carry messages across a yard filled with eighteen or

twenty tracks, with engines and trains moving backwards and forwards, every few minutes. Among these were through trains and also the shifting engines, moving freight and passenger cars to make up trains. His duties required him to carry messages over and across this yard. A more deadly and perilous place could not be imagined. Such duty would have taxed the discretion and judgment of a much maturer person. The defendant did not attempt to show that they had given the child any caution or instruction whatever.

In *Fitzgerald v. Furniture Co.*, 131 N. C., 645, this Court cited with approval the following language from Thompson on Negligence: "The law puts upon a master, when he takes an infant into his service, the duty of explaining to him fully the hazards and dangers connected with the business and of instructing him how to avoid them. Nor is this all; the master will not have discharged his duty in this regard unless the instructions and precautions given are so graduated to the youth, ignorance, and inexperience of the servant as to make him fully aware of the danger to him and to place him, with reference to it, in substantially the same state as if he were an adult." This being a duty devolving upon the defendant, the burden was upon it to show that such caution was given and its nature. But nothing of the kind was even attempted to be shown. It follows that the presumption that such caution was not given is not removed.

In *Ward v. Odell*, 126 N. C., 948, a child eleven years old, employed in a factory, in passing from one part of the mill to another stopped for a moment at a bench where a wire was being cut, when a piece of wire flew off and put out his eye. It was held that the injury was conclusive that the work was dangerous, and that in such case "These little creatures exposed to such dangers against their will cannot be held guilty of contributory negligence." Nor was it a defense that the child was hired to the company by the father. "It was the child's eye which was put out, not the father's. The father could not sell his child nor give the company the right to expose him to danger. The superintendent put these children to work, knowing their immaturity of mind and body, and when one of them thus

put by him in places requiring constant watchfulness is injured every sentiment of justice forbids that the corporation should rely upon the plea of contributory negligence." If that is true as to cutting wires in a factory when the child was not on duty at the time, it is necessarily so as to the danger ten times more deadly of crossing eighteen to twenty tracks with engines and cars constantly moving backwards and forwards and when the child's duties required him to cross the tracks.

On this occasion there was no eye-witness as to how the child was killed, but he was found dead upon one of these tracks with his leg cut off. The inference is irresistible that he was killed by a passing train. *Powell v. R. R.,* 125 N. C., 370. If there could be any possible doubt about it, the evidence was certainly sufficient to be submitted to a jury to draw the inference. The little child being found dead with his leg cut off in such a network of tracks, among constantly shifting trains, creates as strong a presumption that his leg was cut off by one of these trains as when a soldier is found dead on a battlefield with a bullet through his head, that he was killed by the enemy.

It is urged that it is not shown that the little boy in his knickerbockers was on duty, because there is evidence tending to show that he was killed on Sunday morning. The opinion of the Court says: "No one testifies that he was killed on Sunday. We assume it." Yet nothing is better settled than that nothing can be assumed against the plaintiff on a nonsuit. The evidence is that he was employed to carry dispatches across these tracks. The very nature of the work as a necessity in operating trains is conclusive that it was carried on every day. There is no evidence whatever that these messages were not required to be sent on Sunday as well as on other days. It is well known that these through trains, and that also the shifting of cars and engines on these tracks, are operated on Sunday, as well as on other days. His duty was such as could not cease on Sunday. Reference to the decisions of this Court will show cases in which this defendant was sued for the penalty in sending out its freight trains from this very yard on Sunday, and the defense was upheld that it had a right to send out through freight trains. The statute also permits the

dispatching of both local and through passenger trains. It is in evidence in this case that other laborers were present on the yard that morning. Taking the evidence in the light most favorable to the plaintiff, as the law requires us to do on a nonsuit, it is a reasonable inference that the child was there in the performance of the duty of carrying messages from one office to another across these tracks at the time of his death. It is not shown that he had occasion to go there for any other purpose, nor is it reasonable to suppose that after his arduous labors on these other days he would have revisited this spot on the morning in question as a matter of sport or play. The child was killed where he was required to do his work. If for any reason he was not at work at that spot on that day it was the duty of the defendant to show it, and it could have readily done so, if such was the fact. It did not attempt to make such proof.

It was also suggested that the child might have been killed by jumping up on one of the passing trains. One witness testified that he saw him riding on one of the shifting trains that morning. But there is no evidence that he was killed while doing so, and even if it had been shown that he was killed while so riding this would have been contributory negligence, which this Court held in *Ward v. Odell,* 126 N. C., 946, could not be set up against a child under twelve years of age. Besides, contributory negligence must be proven by the defendant. Rev., 483. The opinion of the Court refers to the statements in the answer as if the answer were evidence.

If we are to observe *Judge Daniel's* wise injunction, quoted by the Court, "that we should not be wiser than the law," we will not reverse the humane decisions of this Court, above quoted, in order to defeat a recovery for the death of the little sufferer who by the avarice of the defendant was sent to his death by exposure to an accumulation of perils greater to him in his unguarded and unwarned innocence than that which met the charging column of brave men on Cemetery Ridge. Many soldiers survived four years of war. This child was slain on the fourth day of his employment.

It may be asked, and it will be asked by future ages as well as by the present, why an innocent child of this immature age should have been subjected to such perils, so far beyond his comprehension. This record gives the answer. His mother had seven other children to support. He had a stepfather. And in this combination of circumstances, the mother testifying that she did not know the dangerous nature nor the character of the employment, and indeed did not consent to his being employed, the defendant was able to procure this child's services for the munificent sum of $12.50 per month. This was truly "the price of innocent blood." Had the defendant employed a man or a boy of maturer years it would have had to pay a sum for his services more in proportion to the peril. Such a person would have known the dangers and would have charged for the risk.

By employing these little children the defendant is able to cheapen to that extent, by the competition, the price of other labor.

Nor is there any reason shown why the defendant company should not have put telephones across these tracks and thus have transmitted the messages without exposing any one to such dangers. The only answer to this is the one that was ineffectually made in the *Troxler* and *Greenlee cases,* that it would have cost the defendant company some expenditure to put in the automatic couplers, as here it would cost a little something to put in the telephones.

This Court held, without any statute, but upon the principles of right and justice, in the *Troxler* and *Greenlee cases,* that it was negligence *per se* to subject a grown man to the danger of making a coupling without using automatic couplers, even when the man was instructed as to the danger, and that in such cases the railroad company could not set up the defense of assumption of risk or contributory negligence. This decision has been followed in other States and is a well-settled law in our own courts. Our law is humane.

*Chief Justice Fuller,* not long before his death, in a case of personal injury, in words of burning conviction said: "It is a reproach to our civilization that any class of American work-

men should, in the pursuit of a necessary and useful vocation, be subject to a peril of life and limb as great as that of a soldier in time of war." *Johnson v. R. R.,* 196 U. S., 1. A conservative estimate of the number of workmen killed or maimed in this country every year in industrial accidents is about 500,- 000. It is said that the total number killed and wounded in the Union Army during the Civil War was 385,325. In other words, the whole Confederate Army was unable to kill and cripple as many Union men in four years as are now killed and crippled in industrial employment in a single year.

We cannot expect this condition to improve if the courts can be induced to place the blame upon those killed and wounded, because, in order to make a livelihood and with a purpose of obeying those for whom they labor, they venture in dangerous pursuits, while under such conditions the same courts relieve the master, who created the condition and gave the orders, of all liability and blame whatsoever.

The courts elsewhere have not yielded their assent to the validity of the considerations urged by the defendant in this case.

In *Molaske v. Coal Co.,* 86 Wis., 220, it was held: "The presumption is that a boy under fourteen years of age is not competent to perform duties involving personal safety and requiring the exercise of a good degree of judgment and constant care and watchfulness; and in an action for injuries resulting from negligence of a boy so employed the burden is upon his employer to show that he was in fact competent. Further, no usage to employ boys of such tender years to perform such duties can be upheld." Here the boy was under twelve, instead of fourteen; no negligence by him was shown and no usage to employ boys of such age for such duties.

In *Wynne v. Conklin,* 86 Ga., 40, it was held: "Whether a boy of thirteen employed by the defendant to work in a tinshop was of sufficient age and capacity to appreciate his hazard and provide against danger is for the consideration of the jury." In this case the boy was under twelve and the danger to which he was exposed was fully an hundredfold greater than that in a tinshop, and a North Carolina jury in all justice

should have considered and determined the question whether he was "of sufficient age and capacity to appreciate his hazard and provide against the danger" to which he was exposed.

In *Goff v. R. R.*, 36 Fed., 299 (Va.), it was held an act of negligence on the part of a railroad company to take into its employment as a brakeman a minor of such tender years as not to know the risk of the service.

The rule established by *Bare v. Coal Co.*, 61 W. Va., 28, that "It is actionable negligence for an employer to engage and place at a dangerous employment a minor who lacks sufficient age and capacity to comprehend and avoid the dangers of such employment, even though the employer instructs him as to the dangers incident to the work," is a well-established rule, being laid down in Labatt on Master and Servant, sec. 251; Sh. and Redf. Neg. (5 Ed.), sec. 219; 4 Thomp. Neg., secs. 3826, 4093, 4689; Bailey Pers. Inj., secs. 2758-2777; Dresser Employers' Liability, 466; Buswell Pers. Inj., sec. 203; 2 Cooley Torts (3 Ed.), 1130, 1131; 20 A. and E. Enc. (2 Ed.), 299.

It is a question for the jury to say whether or not the deceased could appreciate the dangers and knew how to avoid them. *Turner v. R. R.*, 40 W. Va., 675; 4 Thomp. Neg., sec. 4098.

The place where the child was put to work being a dangerous one, the question was open for the jury to pass upon the negligence of the defendant. *Cahill v. Stone Co.*, 19 L. R. A. (N. S.), 1094; *Lynch v. Nardin*, 1 Q. B., 29; *Pressly v. Yarn Mills*, 138 N. C., 410.

In this case a child under twelve years of age, undergrown, and therefore known to be immature, was set to work by the defendant in a most dangerous place, exposed to be run over by the constantly passing trains and shifting engines crossing eighteen or more tracks, to carry messages which might have been sent by telephone. He was found dead on the track in the yard with his leg cut off. Under our decisions the company could not show contributory negligence, and neither pleaded nor offered to show any. It was the duty of the company to show that they had instructed any employee, much more a child,

placed in such employment, of its dangers. The defendant did not show this. The work was of a nature which required employment on Sunday as on other days. The child being found dead where he would be passing in carrying his messages, if he was not at work that day the burden was upon the defendant to show it. The defendant did not offer to do so. Upon all the evidence, taken in the light most favorable to the plaintiff, it would seem impossible to conclude that there was not more than a scintilla of evidence tending to show negligence on the part of the defendant.

HOKE, J., concurs in dissenting opinion of CLARK, C. J.