STACY, J., concurring.
This was an action by the administrator d. b. n. of a boy 11 years old for wrongful death alleged to be caused by exposure to dangerous employment, and without instruction as to the danger, by the defendant.
The evidence is that Joe Pettitt, the intestate, a boy 11 years of age, was knocked by a car from the step of one of several moving cars attached to a shifting engine being operated by the defendant on its terminal and transfer yards in South Rocky Mount and caught underneath the wheels of a train of cars and killed, his leg being cut off at the thigh, whereby he bled to death. The evidence is that he was under 12 years of age, not above the average in physical or mental development, and was employed by the defendant to carry messages from the dispatcher's telegraph office across said terminal and transfer yards. *Page 10 
These yards were one to one and one-half miles long, with eighteen to twenty railroad tracks across which the intestate was constantly called upon to pass in delivering messages. It was a place of almost ceaseless activity and along the tracks of which engines and trains were passing backwards and forwards every few minutes during the day, Sundays as well as week days.
The intestate was on duty from 7 a. m. until 7 p. m., seven days in the week and twelve hours in the day. On Sunday, the day of his death, he reported at the usual hour (7 a. m.) for duty at the dispatcher's telegraph office, where he was required to be when not on the yard delivering messages, and later made delivery of one of the messages entrusted to him. He thereafter mounted the step of a moving car and while standing thereon was knocked off by another car and was killed as above stated. It was an established custom for all messenger boys in this service of the defendant at South Rocky Mount, including the intestate, to ride moving trains, engines and cars, in order to expedite the delivery of messages and to avoid being run over by other moving cars and shifting engines.
At the close of the plaintiff's evidence, on motion of the defendant's counsel, judgment was entered of nonsuit, and the plaintiff excepted and appealed.
This appeal is from a nonsuit. Regardless of all statutory regulations, the mere fact of employment of the intestate, a boy less than 12 years of age and wearing knee breeches, the assignment of him to the hazardous task of crossing eighteen to twenty railroad tracks at all hours for the purpose of conveying telegraph and other messages to the numerous officials was a hazardous work, and the assignment of him to such a task constituted negligence on the part of the defendant. In addition, it is not shown that he was instructed or cautioned by the officials in charge as to the dangers incident to the work to which he was assigned.
In Fitzgerald v. Furniture Co., 131 N.C. 639-40, the Court approved the rule laid down in Cooley on Torts, 652, as follows: "Masters may also be guilty in exposing persons to perils in his service which, though open to observation, they, by reason of their youth or inexperience, do not fully understand and appreciate, and in consequence of which they are injured. Such cases occur most frequently in the employment of infants."
In Ensley v. Lumber Co., 165 N.C. 691,Walker, J., approving the above citation from Cooley on Torts verbatim, added: "It is the duty *Page 11 
of the master to exercise due care in giving his servant a reasonably safe place to work, and in the case of youthful or inexperienced employees, this further duty rests upon him; where the master knows, or ought to know, the dangers of the employment and knows, or ought to know, that the servant, by reason of his immaturity of years or inexperience, is ignorant of or unable to appreciate such dangers, to give him such instructions or warning of the dangerous character of the employment as may reasonably enable him to understand its perils." He added that "while the mere fact of the servant's minority does not charge the master with the duty to warn and instruct him if he in fact knows and appreciates the dangers of the employment; and generally it is incumbent upon the jury to determine whether, under all the circumstances, it was incumbent upon the master to give the minor, at the time of his employment, or at some time previous to the injury, instructions regarding the dangers of the work and how he could safely perform it. It is the duty of a master who employs a servant in a place of danger to give him warning and instruction as is reasonably required by his youth, inexperience, or want of capacity, and that will enable him with the exercise of reasonable care to perform the duties of his employment with reasonable safety to himself. 26 Cyc., 1174-1178; Turner v. Lumber Co.,119 N.C. 387; Marcus v. Loane, 133 N.C. 54; Walters v. Sash and Blind Co.,154 N.C. 323; Fitzgerald v. Furniture Co., 131 N.C. 636; Rolin v.Tobacco Co., 141 N.C. 300; Leathers v. Tobacco Co., 144 N.C. 350. Those cases fairly illustrate the rule as it has been applied by this Court, and the Fitzgerald case would seem to be essentially the same in its salient facts as this one, and if not entirely so, there is a sufficient likeness between them to make it a controlling authority. The authorities elsewhere are in harmony with our decision." Judge Walker then, after quoting and approving the above citation from Cooley on Torts, p. 62, adds the following quotation from Thompson on Negligence, 978: "The law puts upon a master, when he takes an infant into his service, the duty of explaining to him fully the hazards and dangers connected with the business and instructing him how to avoid them. Nor is this all. The master will not have discharged his duty in this regard unless the instructions and precautions given are so graduated to the youth, ignorance and inexperience of the servant as to make him fully aware of the danger to him and to place him with reference to it in substantially the same state as if he were an adult." Judge Walker further proceeds in the same opinion to quote to the same effect from Bailey on Personal Injuries, 1291, and from R. R. v. Fort,84 U.S. 553 (where a parent was suing for injuries to his son who was 16 years old), as follows: "This boy occupied a very different position (from an adult). How could he be expected to know the perils of the undertaking? He was a mere youth without experience, *Page 12 
not familiar with machinery. Not being able to judge for himself, he had a right to rely on the judgment of the master, and doubtless entered upon the execution of the order without apprehension of danger. Be this as it may, it was a wrongful act on the part of Collect to order a boy of his age and inexperience to do a thing which in its very nature was perilous and which any man of ordinary sagacity would know to be so." In this case, Ensley v.Lumber Co., the distinguished judge elaborated this proposition by numerous other quotations from other authorities to the same effect.
In Holt v. Mfg. Co., 177 N.C. 175, Judge Walker quotes from the above case of Ensley v. Lumber Co. and the above cited cases and reaffirms the quotation from Fitzgerald v. Furniture Co., 131 N.C. 636, and Cooley on Torts, 652, and Thompson on Negligence, 978, and other authorities, which hold that the master is also guilty of actionable negligence if he expose persons to perils in his service, which, though open to observation, they do not fully understand and appreciate, and emphasizes that the duty is further imposed upon him in such cases to "fully explain the hazards and dangers connected with the business." There is no evidence in this case of any instruction of that kind by the defendant.
Indeed, this Court has held that the intestate being under 12 years of age could not be guilty of contributory negligence as the defendant contends. In Rolin v. Tobacco Co., 141 N.C. 314-315, Connor, J., said: "Within certain ages, courts hold children incapable of contributory negligence. We do not find any case, nor do we think it sound doctrine to say that a child of 12 years comes within that class (capable of contributory negligence). Adopting the standard of the law in regard to criminal liability, we think that a child under 12 years of age is presumed to be incapable of so understanding and appreciating danger from the negligent act or conditions produced by others or to make him guilty of contributory negligence."
But, indeed, in this case there was no evidence whatever tending to show contributory negligence if it had been admissible. There were the simple facts that a boy under 12 years of age, in knee breeches, had been assigned to this dangerous work, and there was no evidence whatever that he was warned of its dangers or that he was capable of understanding the warning if it had been given to him. This case was here, 156 N.C. 119, when a nonsuit was sustained by a divided Court, there being two dissenting opinions. It appears from reference to the majority opinion that two of the judges placed their affirmation of the nonsuit upon the ground (p. 129) that though the Court had held that "when the employment is dangerous, it is not necessary to prove a failure on the part of the employer to instruct `that there was *Page 13 
nothing in the evidence to show that the intestate was on duty or was performing a duty for the defendant. The evidence is vague and unsatisfactory. No witnesses swear what day the intestate was killed, but we assume it was on Sunday, 1907. No witness says that the intestate was on duty the day he was killed or that he was performing a duty for the defendant at the time of his death. These facts were not peculiarly in the knowledge of the defendant, as his mother and step-father knew whether or not he was on duty that day, and both knew he was employed by the defendant and the mother received his wages.'" The third judge placed his decision upon a different ground, that the Legislature had not forbidden the employment of a child under 12 at that time in such employment. The two dissenting judges held that on the evidence the boy was "on duty" when killed.
At the time of the nonsuit in the former case two of the witnesses, for some unknown reason, were absent, but since then they have returned to the State and the evidence on this trial is explicit, by these two eyewitnesses, that the intestate was on duty when he was killed. J. R. Jones testifies that "the deceased was in knee trousers at the time of his death; that there were about twenty tracks on the yard; that he was a messenger boy also in the same service with the deceased; that Joe was killed on Sunday morning; that he himself was on duty the previous night and was relieved by Joe that Sunday morning, who went into service at 7 o'clock delivering messages; that both of them were required to work twelve hours a day and seven days a week; that they received $12.50 per month, and that their duties were to deliver messages at any point on the yard or at any place where messages were to go; that Joe, the deceased, was killed between 10 and 12 that morning; that the yard was used in making up trains going north, south, east and west; that it was a little over a mile long and that it was about a mile from the telegraph office to the most distant point to which they were required to deliver messages. The established custom for messenger boys to deliver messages was for them to ride freight trains or ride anything that would run on the track that they could get a ride on; that he had been working as messenger boy for two years when Joe was killed; that during that time no officer or employee of the defendant had ever objected to the messenger boys riding cars or engines in the yards in delivering messages."
L. C. Johnson also testified that he "was a messenger boy with the plaintiff at the time of his death, and that his duty was to carry messages to the different offices about the yard wherever they sent him: to the freight office, to Mr. Gordon's office, Mr. Wells' office, the chief car inspector's office, then over to the round house and out to the conductors on the yards. It was an established custom at the time of Joe's death *Page 14 
for messenger boys in delivering messages to deliver them as soon as we could get them to their destination, riding, if we could get a chance to ride, on moving trains or cars — any old way; we also rode switch engines. The authorities knew how we were moving around the yard and how we were delivering messages; they saw us use the moving trains. I rode with the train master on the switch engine and there was no objection. We continued the practice of riding the cars and engines in the yard without objection as long as we were around there. When we were at work, Pettitt rode on the engines and coaches. The yard was busy ordinarily in shifting trains twelve hours a day, seven days to the week; about fifteen tracks in the yard, and the yard was about a mile and one-half long. The most distant point for delivering a message was about a mile. I saw Joe the day he was killed in the early part of the morning. He had some messages in his hand, said he had to go to Mr. Gordon's office to carry a message. So he went on over and carried the message, and I saw him after that delivering messages."
He says he did not testify at the former trial as he was down in Georgia.
Another witness, J. W. Batts, testified that he "saw Joe Pettitt pass. He was a small boy wearing knee pants; looked to be 11 or 12; saw him just before he was killed. He was hanging upon the corner of a car that was being moved by the defendant's engine attached to the car. He was hanging to the ladder attached to the bottom of the car. He had his feet on the step of the car and his hand on the grab iron. About a minute after he saw Joe on the moving car he heard somebody scream. He went down there and Joe Pettitt had been run over. His leg was cut off and on the track. He said these shifting cars would barely clear one another, but might not clear a man swinging on the car. There was very small space between the cars. The leg was cut off and was lying on the track when he got there."
Two of the affirmative opinions in the former case were based upon the express ground that there was no evidence that the little boy was on duty in the service of the defendant at the time he was killed. If, therefore, these witnesses had been obtainable at the time, the decision at the former hearing must have been different. It was for the jury to say (if anybody could have denied it) that this service was not only dangerous, but exceedingly so. As was said in one of the dissenting opinions at the former hearing: "In this case, a child under 12 years of age, under-grown and therefore known to be immature, was set to work by the defendant in a most dangerous place, exposed to be run over by the constantly passing trains and shifting engines, crossing eighteen or more tracks to carry messages which might have been sent by telephone. He was found on the track in the yard with his leg cut off. Under our *Page 15 
decisions the company could not show contributory negligence, and neither pleaded nor offered to show any. It was the duty of the defendant to show that they had instructed all employees, much more a child placed in such employment, of its dangers. The defendant did not show this."
And it was also said: "It will be asked by future ages as well as the present, why an innocent child of immature age should have been subjected to such perils so far beyond his comprehension. This record gives the answer. His mother had seven other children to support and he had a step-father, and, in this combination of circumstances, their mother testifying that she did not know the dangerous nature nor the character of the employment, and indeed did not consent to his being employed. The defendant was able to secure this child's services for the munificent sum of $12.50 per month. This was truly `the price of innocent blood.' Had the defendant employed a man or a boy of mature years, it would have had to pay for his services more in proportion to the peril. Such a person would have known the danger and would have charged for the risk. By employing these little children the defendant was able to cheapen, to that extent, by the competition, the price of other labor. There was no evidence on this trial of warning or instruction given to the little boy by the men who exposed him to this dangerous service, and no cause shown why telephones were not used across these tracks to avoid exposing any one to such dangers. We held in Greenlee v. R. R., 122 N.C. 977, and in Troxler v. R. R., 124 N.C. 189, that the fact that `it would have cost the defendant company some expenditure to put in automatic couplers would not be any defense to the exposure of the employee to unnecessary danger.'"
In regard to the danger of this particular employment, it is well known from the governmental reports that the number of workmen killed or maimed in this country every year in industrial accidents is larger by much than the total number killed and wounded in both armies in the four years of the great Civil War. For this reason, public sentiment has been demanding more and more the use of devices that will prevent or reduce the danger in many employments. This has been shown by marked advance in the legislation in probably all the States, certainly in this and in the national Legislature. Indeed, it may well be said again that this little boy "was sent to his death by exposure to an accumulation of perils, greater to him in his unguarded and unwarned innocence than that which met the charging column of brave men on Cemetery Ridge. Many soldiers survived four years of war. This child was slain on the fourth day of his employment." This was said in this case, 156 N.C. 136, and in the interests of the humane and just administration of the law it should be repeated here. *Page 16 
To take the very strongest view of this case for the defendant upon these facts, it was a question for the jury to say whether or not the deceased could appreciate the dangers and knew how to avoid them. Turner v.R. R., 40 W. Va. 675; 4 Thompson on Negligence, sec. 498.
The place where the child was put to work being a dangerous one, the question was open for the jury to pass upon the negligence of the defendant. Cahill v. Stone Co., 19 L.R.A. (N. S., 1094); Lynch v. Mardin, 1 Q. B., 29; Pressly v. Yarn Mills, 138 N.C. 416.
On the former hearing one of the judges put his opinion upon the ground that there was no legislation to prohibit the exposure of a child of this age to any danger in this employment, though this opinion was not expressed by any one else. The present statute does prohibit the employment of "any one under 14 years of age" in messenger or delivery service. C. S., 5032. While that would not be applicable to this case, it is a confirmation of what is said in Pressly v. Yarn Mills, 138 N.C. 410. "The law grows more just with the growing humanity of the age and broadens with the process of the suns."
This being a nonsuit, the evidence must be taken in the most favorable aspect to the plaintiff and with the most favorable inferences which can be drawn from it by the jury. There is no conflict in the evidence of the five witnesses who have testified. But the whole record is before us and it should not pass without comment that the boy was killed on Sunday, 28 April, 1907; his mother took out letters of administration on 13 May, 1907; summons served on 14th of the same month, but the judgment of the nonsuit was entered four years thereafter at June Term, 1911, below and in October here.
The mother having confidence in her case, doubtless owing to the fact, as appears from the above, that the former opinion was rendered against her for the failure of witnesses to appear who would have proved that her son was "on duty" at the time of his death, brought a new action on 5 January, 1912; summons served the same day. She died in 1921, and her oldest son took out letters of administration on 5 May, 1922, and was substituted as plaintiff.
From the date of the death of the boy to the present time has been more than 16 years. During that time approximately 100 terms of the court, with probably 150 weeks of session, have been held in Edgecombe County (including special terms), and there has been a change of personnel of the presiding judge more than 32 times. If the little boy had lived he would be now in his 28th or 29th year.
More than 700 years ago the barons at Runnymede compelled the king to put in Magna Carta the pledge that justice would be "neither delayed nor denied," and this Court has several times said that "a delay of justice is often a denial of justice." *Page 17 
The American Bar Association, composed of some 20,000 lawyers and judges, have in the last few days issued a statement declaring that disrespect of, and even hostility toward, the courts was alarmingly on the increase throughout this country. The deceased was receiving for his dangerous and arduous services of twelve hours a day, seven days in the week, the payment of $12.50 a month. If the defendant deemed that the claim was not just, it was within its rights, if it saw fit, to defend the action, but in common humanity and as a matter of sound policy, the prompt decision of a court should have been procured. The State owes to its people to see that in some way such unreasonable delay as this is shall not be possible, especially where the recovery is sought by a laborer who needs whatever compensation is justly due him.
Whatever the effect, the criticisms by the Bar Association in the address, participated in as it was by the Chief Justice of the United States, may have on the public, so far as it is based, as stated therein, on delays and technicalities by the courts in the administration of justice, it is entitled to our respectful consideration and should be remedied by the courts. It is as unwise to ignore such a state of facts as appears upon this record as it is unjust not to prevent it. We do not seek to place the blame — whether the delay in this instance was caused by an insufficient number of courts, or in the method of their administration or for any other reason. The surest way to insure relief of any grievance is to give publicity to the most glaring cases, at least that those seeking justice may receive it in accordance with the solemn pledge more than 700 years old that "To no man will we sell, or deny, or delay, right or justice."
Though the plaintiff has already waited 16 years during which he has been denied the right to trial by jury to which he is entitled, he has now in addition, when the case goes back, to wait the yet unknown number of years before he can have his rights passed upon.
We have on more than one occasion had occasion to comment upon the unnecessary delays and technicalities in trials of which Chief Justice Taft and other judges have spoken in their opinions as well as in addresses, as being too common in the administration of justice. Among them see Penny v.R. R., 161 N.C. 530, where the delay had been for 15 years, and there had been four trials. "There are others" which have not been thus brought to the attention of the public. In this case, the plaintiff has not yet had the opportunity to have his facts passed upon by a jury.
The plaintiff is entitled to have this case submitted to the jury upon proper instructions as to the law applicable. The judgment of nonsuit is
Reversed. *Page 18