This is an action for actionable negligence brought by plaintiff against defendant. The plaintiff was a salesman in the store of defendant; his duties were to assist in checking stock against invoice, and to take stock out of the shelves in the storeroom, and generally to perform such duties around the store of the defendant as he was ordered to perform in connection with the receipt, handling, and sale of merchandise, the duty to perform various services usually performed by salesmen. The allegations of negligence made by plaintiff: "That the defendant was guilty of negligence which proximately caused the injuries of the plaintiff, in the following particulars, viz.: (a) The defendant failed to use or exercise ordinary care to provide for the plaintiff a safe place in which to work, and required him, in the discharge of his duties, to climb upon shelves which were unsafe and dangerous, and were likely to turn and throw him to the floor and injure him. (b) The defendant failed to provide for plaintiff safe and suitable appliances with which to do the work which he was required to perform, and failed to furnish him any stepladder, bench, or other appliance upon which to climb or stand when placing the hats on the top of the shelves in its said building, and required him to climb upon the shelves in order to place the hats on top thereof. (c) The defendant allowed one of the shelves upon which the plaintiff, and its other employees, were required to climb, to be and remain in a defective condition, so that when the plaintiff stepped upon same in the course of his duty and regular line of his employment, it split and turned so as to throw plaintiff to the floor, and although defendant required its employees to climb upon the shelves, it failed to inspect same and to make same reasonably safe for use by its employees in climbing. (d) The defendant's manager, under whom the plaintiff was working, negligently ordered and directed plaintiff to climb upon the shelves which had been built in defendant's storeroom for the purpose of placing hats in the boxes on the top of said shelves, although the said shelves had not been built for the purpose of being climbed upon, and were not sufficiently strong to be used for that purpose, and were not inspected and kept in a safe condition for that purpose."
The plaintiff alleged that as a result of the aforesaid negligence of defendant, the shelf was in a defective condition, and he was thrown to the floor, and from the fall his left knee was permanently injured.
The defendant denied any negligence on its part, and set up the plea of contributory negligence. "That if the plaintiff was injured by the *Page 807 
negligence of the defendant, as alleged in the complaint, which is expressly denied, the plaintiff by his own negligence contributed to his said injury, which said contributory negligence was the direct and proximate cause of whatever injuries he suffered, in that he conducted himself on and about the said shelves in a negligent and careless manner, in that he voluntarily jumped therefrom and failed and refused, in conducting himself on and about the said shelves, to use the safe means which were available, and failed to act with due regard for his safety."
The material part of Cecil (R. C.) Robinson's, plaintiff's, testimony necessary to be considered in the determination of the case is as follows:
PLAINTIFF'S TESTIMONY.
I was working with J. B. Ivey Company on 17 April, 1925. I had been working there 6 or 8 months in the gents' furnishing department. I was 21 years old. I was making $21.50 per week and a bonus, which amounted to a week's pay every month if the department made its quota. The gents' furnishing department was on the first floor. My superior was Charles Creighton. I got hurt in the stock room on the 5th floor. I was up there checking an order of some straw hats that had arrived for our department. Mr. Creighton went up there with me. I had not been doing that kind of work before. I was checking an order of some straw hats with Mr. Creighton in the stock room. The hats were on top of the shelves on top of a section of shelves in the stock room. I was getting a hat of each style down to check the order. The hats were on top of the shelves in the stock room on top of a section of shelves. They were in pasteboard boxes. The boxes were about 3 feet deep. The section of shelves that I refer to was in the middle of the stock room. The top of the shelves was about eight feet, and the top of the shelves was about 4 or 5 feet wide. There were 6 or 7 shelves from the floor up to the top. I went to the stock room with Mr. Creighton. He was my superior.
Q. After you and Mr. Creighton got up there, what did Mr. Creighton tell you to do, if anything? A. Climb on the shelves and take the hats down, one of each style.
Q. Did you do that? A. Yes, sir.
Q. Where was Mr. Creighton when you did that? A. He was sitting on a box down there, and I would pitch him the hats down there.
Q. Did he tell you how to get up on top of the shelves? A. Yes.
Q. What did he tell you? A. Climb those shelves.
Q. What did you do after you got up on top of the shelves? A. I pitched him the hats down, different styles.
Q. How many times before had you ever climbed on top of those shelves? A. I had never climbed up before. *Page 808 
Q. What other way was there for you to get on top of the shelves except to climb if you did? A. No other way.
Q. What other implements did they have around there that you could use in getting up there? A. Not any.
Q. After you got the hats, what did you do? A. I came down.
Q. Then what happened? A. He checked the orders of the hats, and when he had finished with the hats he took two or three of them down by the office and told me to put the rest of them back in the boxes.
Q. Where were the boxes? A. On top of the shelves.
Q. Go ahead and describe what you did then. A. I was taking the hats up, two hats, and I had put them together and put them in the shelf then climbed so I could get them up, and as I was climbing up on about the third or fourth shelf and started to take a step and the shelf broke, pulled loose, gave way, or something, and that threw my foot off and I fell down and my leg was like this; it threw me down.
THE NECESSARY EVIDENCE OF DEFENDANT.
Charles Creighton's testimony, in part, on cross-examination, is as follows:
I am manager of the men's department at Ivey's, and the plaintiff was working in that department under my orders and instructions. It was his duty to do what I told him to do. On this day, 17 April, 1925, I wanted to go up in the stock room and do something with reference to some straw hats, and I took the plaintiff along with me, it being his duty to do what I told him. These hats were in boxes on top of the shelves. There was a double row of shelves meeting back to back. . . . I was not going to get a hat out of each of the boxes, but only out of some of the boxes. I had the list of stock numbers of the boxes out of which I wanted to get each particular hat. I did not tell the plaintiff how to get up there; I told him to get up there. There were always ladders in the stock room, a step-ladder. I do not know where it was that particular day; I did not say anything to him about getting a ladder. There was not one at that particular spot. The plaintiff had been in the stock room several times. I was standing right there with him, within about 3 feet. I told him to get up on top of the ledge or platform. I left it to him as to how he should get up there.
Q. How did you intend for him to get up there? A. I left that to him.
Q. How did you expect Mr. Robinson to get up on the top of the platform? A. I expected, if he wanted to be very careful, to go get the ladder and climb up there.
Q. You expected him to get the ladder and climb up there, is that what you tell the jury? A. Yes. *Page 809 
Q. And it surprised you when he did not do that? A. It did not surprise me.
Q. He did not do what you expected him to do. You just now told the jury when you told him to get up there you expected him to go and get the ladder and climb up there? A. Yes.
Q. And when he did not do that, he did not do what you expected him to do, did he? And you stood there and saw him climbing up on the shelves? A. Yes.
Q. And you did not tell him not to do it? A. No, sir.
The witness Creighton did not see the plaintiff fall, as he had left the place.
E. T. Whitaker testified in part: "I am in the employ of J. B. Ivey 
Company, and I was in its employ in April, 1925, as stock-room manager. I remember the occasion when Mr. Robinson was hurt. On the day Mr. Robinson was hurt, Mr. Creighton and Mr. Robinson came to the stock room together. Mr. Creighton told Mr. Robinson to go up on top of some shelves and throw him down some boxes of hats, and Mr. Robinson went up there and threw the hats down to Mr. Creighton, and Mr. Creighton took out what he wanted. Ed Earl was helping at the time they were getting those hats, and he told Earl to throw the boxes back up to Mr. Robinson, and he took the hats he wanted and went on downstairs. From the time Mr. Robinson got up on the shelves until Creighton left, Robinson was up on top of the ledge. When I say ledge, I mean the top of the shelves. When Mr. Creighton left, Ed Earl threw the boxes of hats back up to Mr. Robinson and he placed them back where they should go. Ed finished throwing all the boxes up and then Robinson slid down off the front of the shelves, the end of them.
"Q. Will you just show on the end of this table exactly how he did, assuming the side of the table toward the stenographer is the side of the shelves? A. He put his hands on the edge of the shelf and slid down backwards, slid down as far as he could go, then dropped to the floor. When he dropped to the floor he fell down on his knees and got up and hobbled over to a chair right beside my desk, sat down, laid his head down on a little wagon, and was sitting there, and he sat there a minute or two, and I says, `Robinson, what is the matter?' He says, `I hurt my leg; I must have strained it when I dropped down off of those shelves.' He says, `I hurt it once before and I hope it is not hurt like it was, because I had to go on crutches for quite a while before.' I then called up Mr. Creighton and told him Mr. Robinson was hurt, and I would bring him down on the freight elevator."
Ed Earl's testimony was practically the same as the witness Whitaker's as to how the plaintiff was injured. *Page 810 
Cecil (R. C.) Robinson was corroborated by statement to his father, Rev. C. M. Robinson, a few days after the injury.
The issues submitted to the jury, and their answers thereto, were as follows:
"1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: `Yes.'
"2. If so, did the plaintiff by his own negligence contribute to his own injury, as alleged in the answer? Answer: `No.'
"3. What damage, if any, is the plaintiff entitled to recover? Answer: `$2,500.'"
The court below rendered judgment for plaintiff on the verdict. Defendant assigned numerous errors, and appealed to the Supreme Court.
The necessary assignments of error will be set forth in the opinion.
There are no exceptions made by defendant to the charge of the court below. The defendant contends: (1) That plaintiff should have been nonsuited, C. S., 567; (2) that defendant was entitled to a directed verdict; (3) that upon the undisputed evidence the plaintiff failed to make out a case of actionable negligence. We cannot so hold.
On motion to nonsuit, the evidence is to be taken in the light most favorable to plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.
As to how the occurrence took place, and what caused the plaintiff's injury: Plaintiff contends that "the shelf broke, pulled loose, gave way,or something," that caused the fall. Defendant contended that after plaintiff had put all the boxes back where they should go, "Robinson sliddown off the front of the shelf, the end of them. . . . He put his hands onthe edge of the shelf and slid down backwards, slid down as far as he couldgo, then dropped to the floor."
The disputed facts as to how plaintiff was injured, the jury accepted the plaintiff's version. We can only consider here "any matter of law or legal inference." Const. N.C. Art. IV, sec. 8. There is an impenetrable wall between the law and the facts. The facts for the jury, the law for the court.
In the present case, Creighton, who gave the order to plaintiff, was not a fellow-servant of the plaintiff. He was, in law, the vice-principal,alter ego, of the defendant company. Creighton himself testified that he was the manager of the men's department of defendant company, in *Page 811 
which plaintiff was working, and plaintiff was under his orders and instructions. "It was his duty to do what I told him to do." Plaintiff said: "My superior was Charles Creighton." Patton v. R. R.,96 N.C. p. 455; Thompson v. Oil Co., 177 N.C. 279; Davis v. ShipbuildingCo., 180 N.C. 74.
In passing, we may state the doctrine of fellow-servant has been abrogated by statute as to railroads operating in this State. C. S., 3465.
Defendant contends: Just before plaintiff was hurt, the shelves stood the highest possible test. When the plaintiff was hurt he knew more about the shelves than anyone else. Plaintiff was allowed to go about his work in his own way. It was a simple thing he was doing, in his own way. That climbing is one of the primal instincts. Defendant cites many cases in which nonsuits were granted: The hammer case, Martin v. Mfg. Co.,128 N.C. 264; the gangway case, Shaw v. Mfg. Co., 143 N.C. 131; the railroad window case, House v. R. R., 152 N.C. 397; the old shed case,Rumbley v. R. R., 153 N.C. 457; the crosstie case, Simpson v. R. R.,154 N.C. 51; the coal wagon case, Bradley v. Coal Co., 169 N.C. 255; the box car case, Bunn v. R. R., 169 N.C. 648; the slick-face hammer case,Morris v. R. R., 171 N.C. 533; the axe-head case, Winborne v. CooperageCo., 178 N.C. 88; the tree case, Angel v. Spruce Co., 178 N.C. 621.
Defendant cites from the Rumbley case, supra, the following: "The Court said: `The work that plaintiff was given to do was simple in operation, well within his experience and training, and he was left to select his own methods of doing it."
We think the decisions bear out the contentions of defendant based on the facts as defendant views them, but we cannot so interpret the facts. In the present case the jury has found the facts as contended by plaintiff. Plaintiff's vice-principal, Creighton, who plaintiff was in duty bound to obey, was ordered by Creighton to climb some shelves in the stock room on the fifth floor, and get some hats out of pasteboard boxes on top of the shelves. Plaintiff had never climbed up the shelves before. The shelves were in sections. There were about 7 shelves from the floor to the top. Plaintiff climbed up and pitched the hats down to Creighton. He then came down and Creighton checked the orders and took two or three hats and told him to put the rest in the boxes on the top shelf. He started climbing up with the hats and when up on the third or fourth shelf "started to take a step and the shelf broke, pulled loose, gave way, or something, and that threw my foot off and I fell down, my leg was like this; it threw me down."
The plaintiff charged negligence, "(1) defective and unsafe condition of the shelf; (2) failure to furnish a step-ladder; (3) negligent order of Creighton, the plaintiff's superior." *Page 812 
In the Patton case, supra, in obedience to the command of a vice-principal (section master), the employee on a freight train, while passing the place where the employee was to work, was ordered by the section master to jump from the moving train. The employee promptly obeyed the command, and the Court said: "The facts and circumstances were such as that he might, when suddenly called on, not unreasonably believe that the command was a proper one, that he ought to obey. Although the act was hazardous, it was not essentially dangerous. It was done suddenly and in obedience to the command of one who had the right to direct the laborer in the course of his duty. The latter had but a moment to think of duty — a moment to think of danger. The law attributes the injury in such case to the negligence of the employer; its agent gave the unwarranted, negligent command, the injured party simply obeyed, and was not negligent because under the circumstances he did obey. It would be unreasonable and unjust to allow the employer to have immunity from civil liability for its own negligence, or that of its agent, thus resulting in injury to a faithful servant."
In Howard v. Oil Co., 174 N.C. at p. 653, it is said: "It is well recognized that, although the machinery and place of work may be all that is required, liability may, and frequently does, attach by reason of the negligent orders of a foreman, or boss, who stands towards the aggrieved party in the place of vice-principal. Ridge v. R. R., 167 N.C. 510; Myersv. R. R., 166 N.C. 233; Holton v. Lumber Co., 152 N.C. 68; Noble v.Lumber Co., 151 N.C. 76; Wade v. Contracting Co., 149 N.C. 177."
Plaintiff was working under the direct orders of defendant's vice-principal. See Noble v. Lumber Co., supra, where a servant was ordered to remove a shiver from a running machine; Myers v. R. R., supra, where a servant was ordered to board a moving train; Ridge v. R. R., supra, where a servant was ordered to walk across the top of a freight car while the roof was "jumping up and down" (at p. 522); Howard v. Oil Co., supra, where a servant was ordered to remove a saw cylinder while the saw was in motion;Thompson v. Oil Co., supra, where a servant was ordered to "scotch" a car with a crowbar; Davis v. Shipbuilding Co., supra, where a servant was ordered to work under a defective crane; Tatham v. Mfg. Co., 180 N.C. 627, where a servant was ordered to remain at work while a train was approaching; Perkins v. Wood and Coal Co., 189 N.C. 602, where an emergency servant was ordered to work under a steam shovel which was tripped by another servant. Terrell v. Washington, 158 N.C. at p. 289;Thomas v. Lawrence, 189 N.C. p. 521; Fowler v. Conduit Co.,192 N.C. p. 14; Burgess v. Power Co., ante, p. 223; Butler v. FertilizerWorks, ante, p. 632; 26 Cyc., 1185, 1213, 1216. *Page 813 
The place of the accident was on the fifth floor of a large department store; nothing was provided for plaintiff to climb up on to get the hats in the boxes on the top shelf. No step-ladder or other usual and common appliance. From the reasonable inference of the testimony, the stepladder could have been easily obtained by Creighton, the vice-principal. It seems to be in common use, and rightly so, for the purpose. Creighton ordered plaintiff to climb the shelves. He obeyed. The shelf broke, etc., and he was injured. A small matter of getting the step-ladder — a trifle, as it were, would have saved plaintiff perhaps a lifetime of suffering.
In Clinard v. Electric Co., 192 N.C. p. 742, it is said: "In Bailey v.Meadows Co., 154 N.C. p. 71, it is held: `That it is the duty of the master to furnish the servant proper appliances to do dangerous work, if there are such in general use, is well settled. Orr v. Tel. Co.,130 N.C. 627. This negligence of the master `consists in his failure to adopt and use all approved appliances in the performance of their duties.'Marks v. Cotton Mills, 135 N.C. 290. The master is not required to adopt every new appliance as soon as it is known.' The duty of an employer to use due care to furnish sufficient help, tools, etc., to the employee is held inPigford v. R. R., 160 N.C. p. 93, to be a `primary, absolute, and nondelegable duty.' It will be noted in the Bailey case, supra, it speaks ofdangerous work. In such cases the appliances must be such as are in general use. The removal of the steel tank weighing 530 pounds is not necessarily dangerous, although the method of doing it may be. Simple appliances or instruments, is a matter of common knowledge and observation, such as ropes, chains, etc., and sufficient help may, under certain circumstances, of necessity be needed."
It may be of interest to note that the senior of the present firm representing defendant, able and learned, a Nestor of the bar, was the attorney for Orr in the Telephone Co. case, supra, which blazed the way in this State that the employer must use due care in furnishing appliances and instrumentalities for protecting employees. In that case it was held: "Where a telephone company fails to furnish an employee with proper tools and appliances with which to do dangerous work, it is liable for injury caused by such negligence."
Without obedience, we would have chaos and anarchy, the industrial life would be stagnant. The plaintiff was under the instructions of defendant's vice-principal. Under the facts and circumstances of this case he was ordered to climb the shelves in obedience to duty and command. The shelf broke, etc., and he was thrown down and permanently injured — from the finding of the jury — without fault on his part; unless it is a fault for an employee to obey his superior under such circumstances. *Page 814 
We cannot so hold. The charge is not in the record; the presumption is that the court charged the law correctly on all the issues, laid down the rule of due care, the prudent man, under the facts and circumstances of the case; charged correctly as to negligence, proximate cause, contributory negligence, and damages.
In this State it is held, on the question of proximate cause (see cases cited in Clinard v. Electric Co., supra, at p. 741): "That it is not required that the particular injury should be foreseen, and is sufficient if it could be reasonably anticipated that injury or harm might follow the wrongful act."
We can find
No error.