D. V. HOGGARD, Administrator of Garland Hoggard, Deceased, v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 21 September, 1927.)

1. **Negligence—Railroads—Bridges—Guard Rails—Evidence—Nonsuit—Questions for Jury.**

Evidence tending to show that a railroad company maintained a bridge generally used by the public on a street of a town twenty-three feet above its track, with a banister supported by posts eight feet apart with a ten-inch plank at the top and bottom running with the lengthway of the bridge, leaving an open space between the planks twenty-three inches wide, is sufficient to sustain a verdict against the railroad company, and to deny its motion as of nonsuit, for its negligence in providing a bridge with insufficient guards to protect those using it, with other evidence tending to show that the intestate, a lad of 9 years of age, was playing

HOGGARD *v.* R. R.

on the bridge with other children, stumped his toe on a nail on the bridge about two feet from the rail, and thus was precipitated through the opening between the planks upon the track below and received an injury which caused his death.

**2. Same—Contributory Negligence—Children.**

> *Held,* under the evidence in this case it was a question for the jury to determine whether the plaintiff's intestate, a nine-year-old lad, was guilty of such contributory negligence as would bar his recovery, notwithstanding the negligence of the defendant railroad in not providing a bridge twenty-three feet above its track with sufficient banisters to prevent his falling through to the track below, thus sustaining injuries that caused his death.

APPEAL by plaintiff from *Grady, J.,* at April Term, 1927, of HERTFORD. Reversed.

This is an action for actionable negligence by D. V. Hoggard, administrator of Garland Hoggard, deceased, against the Atlantic Coast Line Railroad Company. The complaint alleged negligence in the construction of a bridge over defendant's roadbed, in the town of Tunis, N. C. The defendant denied any negligence and set up the plea of contributory negligence.

The bridge is described by R. W. Peele, a witness for plaintiff, as follows:

"I live at Tunis. I know the bridge on which Garland was hurt. The railing on this bridge has a four-foot banister, a ten-inch board at the bottom and a ten-inch board at the top, and nothing in between— about a twenty-three inch space in between the boards and the railing. The posts holding the railing are eight feet apart. The bridge is about twenty-three feet above the railroad.

"Q. Is the bridge used by the public? A. Absolutely, by anybody who wants to cross it—a good many people living either side of it use it.

"A street from Main Street leads to this bridge, crosses the railroad, and citizens on the west side of the railroad use this bridge to go to church, school, depot, postoffice, and stores down town. It is a public pass-way."

The plaintiff's intestate was nine years old.

As to the occurrence, E. H. Gardner testified, in part:

"I live at Tunis; knew Garland Hoggard. I saw him the day he was injured. I was about twenty-five or thirty yards away. There were several children running and playing, the Hoggard boy was in the lead. He stumped his toe and fell, pitching through the railing on the side of the bridge over the Atlantic Coast Line track. He was looking back when he stumped his toe. . . . Hoggard was running across the

17—194

bridge; he stumped his toe and went between the boards forming the rail or guard on the bridge. I went to the bridge as soon as I could after he fell. . . . Garland's head and shoulders were on a cross-tie. . . . His shoulders had hit the railroad iron. He fell back with his neck kind of doubled back with one leg and one arm on the track. We picked him up and took him home. The accident happened about eight o'clock in the evening of 8 July, 1921. That was Friday. He died the following Sunday. He was healthy and bright as the average boy and about like them as to behavior. . . . Q. You say the boy stumped his toe? A. Yes, sir. I was sitting on my porch and was looking at the whole bunch of children. I don't know what he stumped his toe on—it might have been a nail. . . . I know he stumped his toe because it was torn to pieces when we got to him. The boy tried to catch with his hands to a post, but he was too far from it. When I found the little boy he was on the rail on the east side; this is the rail furthest from my house. The other boys were right behind him, and came up to the bridge, but turned back when they saw him fall. When he stumped his toe he was looking back, and as I said, fell and went through the rail. He was not more than two feet from the rail of the bridge when he stumped his toe." The boy's skull was fractured and shoulders broken.

At the close of plaintiff's evidence defendant moved for judgment as in case of nonsuit. C. S., 567. The court below sustained the motion. Plaintiff excepted, assigned error and appealed to the Supreme Court.

*Roswell C. Bridger and Travis & Travis for plaintiff.*
*John E. Vann and Small, MacLean & Rodman for defendant.*

CLARKSON, J. The only question presented on the record was whether the court below, under the facts, ought to have nonsuited the plaintiff. We think not.

In building the bridge the banisters were constructed with a plank 10 inches wide at the bottom on the floor of the bridge, then a space of 23 inches, and another 10-inch plank at the top, making a banister between 3½ and 4 feet high, with an open space between the top and bottom railings 23 inches wide. This open space extended from end to end of the bridge on both sides, being broken only by the posts, which were spaced 8 feet apart. The bridge was at the intersection of the street on which it was built, and Main Street, and was much traveled. Plaintiff's intestate was a boy 9 years old. On the day in question he was running, apparently in play with some other children who were following him. He started across the bridge, and when about the top, and about two feet from the railing, looked back toward his companions,

stumped his toe and pitched headlong through the two feet space in the railings to the railroad track below. He attempted to catch one of the posts, but was too far away and missed it. The floor of the bridge is 23 feet above the track, and the boy's head and shoulders struck the rail of the track, breaking his shoulder and fracturing his skull. He died the next day.

In the present action it is conceded that it was the duty of the defendant to build the bridge over its railroad along the street.

The principle governing the necessity of guard rails and barriers is set forth in Vol. 9 C. J., p. 477, sec. 79, in part, as follows: "Where guard rails to a bridge or its approaches are clearly necessary for the safety of travelers, a failure to erect or properly to maintain them is negligence for which the municipality or the company charged with the duty to maintain the bridge is liable to a party who in the observance of due care is injured by reason of such neglect, and this it seems is so, though there is no statutory requirement that guard rails should be placed on the bridge."

It would be negligence *per se* for defendant to fail to provide railings or barriers on both sides of a bridge of the kind described in this action. *Stout v. Turnpike Co.,* 153 N. C., p. 513; 4 R. C. L., p. 217.

The guard rails were constructed with an open space of twenty-three inches. The principle applicable: did defendant use such care as a reasonably prudent man would exercise under the same or similar circumstances? Was the failure the proximate cause of the injury? *Morris v. Mills* (S. C.), 113 S. E., 632; *Tannian v. Amesbury,* 219 Mass., p. 310.

In *Campbell v. Laundry,* 190 N. C., at p. 654, it is said: "Negligence was defined according to Baron Alderson's formula: 'Negligence is the omission to do something which a reasonable man, guided upon those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do.' Pollock on Torts, 442."

A highway or street is open for all—both adults and children. "The use thereof by children for purposes of play and sport is not as a matter of law an illegitimate use of a highway, 'Not to be anticipated by the authorities whose duty it is to keep highways in a reasonable safe condition.'" *Morris case, supra,* p. 634.

"Children, wherever they go, must be expected to act upon childish instincts and impulses, and others who are chargeable with a duty of care and caution toward them must calculate upon this, and take precautions accordingly." *Chief Justice Cooley* in *Power v. Harlaw,* 57 Mich., 107; *Loughlin v. Penn. R. R. Co.,* 240 Pa. St. Rep., at p. 179.

In the present case the boy was 9 years of age. The question of contributory negligence is one for the jury. While a child of tender years

is not held to the same degree of care as one of mature years in avoiding an injury arising from the negligent act of another, it is ordinarily a question of fact for the jury to determine, in an action to recover damages therefor, whether under the circumstances, and considering his age and capacity, he should have avoided the injury complained of by the exercise of ordinary care. *Alexander v. Statesville,* 165 N. C., 527; *Fry v. Utilities Co.,* 183 N. C., 281.

In *Starling v. Cotton Mills,* 168 N. C., 229 and 171 N. C., 222, the child was 5 years old, and was held not to be guilty of contributory negligence. To the same effect in *Comer v. Winston-Salem,* 178 N. C., p. 383, the child was 28 months old. In *Campbell v. Laundry, supra,* the child was 4 years old, and the many cases cited therein were children under 7 years of age—it was held that contributory negligence could not be attributed to them.

In *Ellis v. Power Co.,* 193 N. C., p. 357, a young boy 9 years of age was held not guilty of contributory negligence in picking up an uninsulated electric wire near the pathway leading to and from his home. The Court, in that case, said: "It is a matter of common knowledge that this wonderful force is of untold benefit to our industrial life. Electric power is an industry-producing agency, and the hydro-electric development has been one of the greatest factors in the State's progress, and especially its industrial expansion. Every legitimate encouragement should be given to its manufacture and distribution for use by public utility corporations, manufacturing plants, homes and elsewhere. On the other hand, the *highest degree of care* should be required in the manufacture and distribution of this deadly energy and in the maintenance and inspection of the instrumentalities and appliances used in transmitting this invisible and subtle power." See cases cited in *Graham v. Power Co.,* 189 N. C., p. 381.

For the reasons given the judgment is

Reversed.