MANLEY REAVES v. CATAWBA MANUFACTURING AND ELECTRIC
POWER COMPANY.

(Filed 2 May, 1934.)

1. **Master and Servant A a: C a—Evidence held not to disclose emergency empowering employee to hire another for employer.**

The evidence disclosed that plaintiff, when a boy of thirteen years of age, took dinner to his brother who was working for defendant in the ·construction of a house, that one of the carpenters dropped his hammer from the second floor and defendant's foreman asked plaintiff to hand the hammer back to the carpenter, that no ladder was built for access to the second floor, but that braces were nailed at the corners by which the carpenters climbed up and down, that plaintiff chose to climb up by a window, and in attempting to reach a joist over his head, slipped and fell to his injury. *Held*, no emergency existed sufficient to constitute plaintiff an employee and create the relation of master and servant, and plaintiff was a mere volunteer injured in the performance of a simple and ordinary task, and N. C. Code, 5032, has no application to the action.

2. **Negligence A c—Held: evidence failed to show negligence on part of owner in respect to volunteer or trespasser on premises.**

At the request of defendant's foreman, plaintiff, when a boy thirteen years of age, volunteered to hand a hammer to a carpenter working on the second floor of defendant's building. The evidence tended to show that there was no ladder between the first and second floors, but that the carpenters climbed on braces at the corners of the building, and that plaintiff chose to climb up at a window, and in attempting to catch a joist above his head, slipped and fell to his injury. *Held*, plaintiff occupied the position of volunteer or trespasser, and the evidence failed to show any defective condition or circumstances in which defendant was required to warn or instruct the plaintiff, and defendant cannot be held liable in damages for the injury, there being no legal basis for recovery.

APPEAL by plaintiff from *Stack, J.,* at February Term, 1934, of MECKLENBURG. Affirmed.

This is an action for actionable negligence brought by plaintiff against the defendant. The plaintiff's testimony was to the effect that he was injured some ten years ago—in October, 1924—when he was 13 years of age, he is now 23 years of age. His brother, Edgar, at the time he was hurt, was working for defendant as a brick mason. The defendant was building a frame dwelling-house. The plaintiff lived 3 or 4 miles away and on the day in question (and the only day he carried a lunch), he rode a horse and from his home, carried the lunch in some dishes in a bucket to his brother. He testified, in part: "I stayed there during lunch. Afterwards, I was getting ready after lunch to get the dishes up and went to tell my brother I was going home and the carpenter on top of the house dropped his hammer and he asked

me to get his hammer. Mr. Armstrong was the one that dropped the hammer and Mr. Black was the one that told me to take it up. Mr. Black was the foreman. . . . I started with the hammer. The house was frame and the rafters were raised. I started to climb up through a window and got up in the window and was climbing up to reach a joist to hand Mr. Armstrong the hammer and I slipped and fell, my hand slipped off the joist. That let me fall inside across a sleeper and broke my leg. That was the floor sleepers." By the court: "Was that window on the first floor, ground floor or second story? Answer: First floor. Q. How far had you climbed? Answer: 8 feet story. Q. Had you climbed 8 feet? Answer: Yes, climbed up to the second floor. There was no ladder there. There was no ladder afforded for any of them to go up on. I climbed up into the window, was catching up and climbed the post in the window frame. I climbed up in the window and was climbing over the window to reach up high enough to get him the hammer and as I caught the joist, I fell. I caught hold of a two by four, the framing. I climbed on the window frame and tried to get up to the top of the frame. I put my feet on the window frame and was going on up past it and holding to it. As I went up past it, I put my feet on top of it when I got up that high. I tried to go higher than that and got as high as I could, but I fell. My hand slipped off the top joist. That was a top joist that the rough framing rested on, up next to the roof. That was up at the top. I reckon I fell about eight feet. In climbing up there were no cross pieces across that way to put my feet on. I was in the act of taking the hammer up when I fell. I was handing it to him. I had one hand on the joist and the hammer in the other. I went to swing my hand with the hammer up through and it slipped and fell. . . . When I was told to go up on the house, I was preparing to go home. I had hitched my horse. I was about ten feet from the place where the hammer fell when I was told to take it up. Mr. Black said, 'Boy, take that hammer up to the carpenter.' "

Edgar Reaves testified, in part: "I was a brick mason on this job. I worked on this job at the time. Mr. Black employed me. He paid me $1.00 an hour. . . . When I got through dinner I went back to work. I don't know if anybody asked my brother to bring the hammer up. I did not hear it. I sent after a hammer myself by Mr. Armstrong. He was up on the building. . . . There was not any ladder there to get up on the house at that time. I went up at the corners with braces. Climbed up at the corner. They did not have any ladder there. That is the way they went up and down. I have worked on other buildings. I had been working at that time on buildings about ten years. They did not have any ladder at all at this place for you to get up, just go up on the corners. They put braces across another and you

stepped from one to the other and grabbed a joist and swung through. . . . . The window was about fifteen feet away from the corner where I went up. It could be seen from the window where I went up. The braces within that space were about 3½ feet apart. There were two braces. You stepped on them and grabbed a joist and pulled yourself up. As you stepped on this last brace, you would have to pull yourself through. You would do that by grabbing the overhead joist. It would be about 3½ or 4 feet from the last brace. I could not say whether my brother could have gotten up at that corner or not, taking into consideration the size of my brother at the time. On a building like that, they put a ladder up because you have to be going up and down."

On cross-examination: "Mr. Armstrong was working on the same side of the building. He was waiting on me. I told him to send me a hammer. . . . We was starting a stove flue and I told him to get me a hammer; he walked about 15 feet towards the house. It was not on the ground. The next thing I knowed, the boy had fallen. Mr. Armstrong and I both went down on the ground, but not before the boy fell. When we went up, they had cross pieces there at the corner for me to climb up on. And I went up that way. Mr. Armstrong went up that way too. The carpenters, anybody that had to go up would go up different ways; I did not watch all of them. That's what they were put there for."

The judgment of the court below is as follows: "This cause coming on to be heard before the undersigned, judge presiding, and a jury, at the 5 February, 1934, Regular Civil Term of Superior Court of Mecklenburg County, and the plaintiff having introduced evidence, and the court being of the opinion at the conclusion of the plaintiff's evidence that the plaintiff ought to be nonsuited: Now, therefore, upon motion of W. S. O'B. Robinson, Jr., attorney for the defendant, it is ordered, adjudged and decreed that the plaintiff be and he is hereby nonsuited, and that the costs of the action be taxed against the plaintiff. This 16 February, 1934.                    A. M. STACK, *Judge Presiding."*

*G. T. Carswell and Joe W. Ervin for plaintiff.*
*W. S. O'B. Robinson, Jr., and W. B. McGuire, Jr., for defendant.*

CLARKSON, J. At the close of plaintiff's evidence the defendant made a motion for judgment as in case of nonsuit. C. S., 567. The court below granted motion and in this we can see no error. The interesting question arises on the record: What duty does the defendant owe to this volunteer boy 13 years of age? The general rule is thus laid down in Cooley on Torts, 4th Ed., Vol. 3, section 386, pp. 47 and 48: "One who voluntarily assists a servant at the latter's request does not, as a

general rule, become a servant of the master so as to impose upon the latter, the duties and liabilities of a master towards such volunteer, or so as to render the master liable to third persons injured by such volunteer's acts or negligence, while rendering such assistance. Such a volunteer assumes all the risks of the service upon which he enters and is only entitled to the protection due a trespasser. But if the servant has authority, express or implied, to employ assistants, the rule is otherwise, and the master is liable for the negligence of one employed by a servant who had authority to employ assistants though he had been forbidden to employ that particular person. Such implied authority might arise in case of some unforeseen emergency, which created a necessity for such assistance. And when a passenger is injured by the negligence of a volunteer, the master is liable, though the volunteer was called in by a servant without the knowledge or authority of the master, and the reason is that 'when the master obligates himself to transport a person from one place to another safely and properly, and to protect him from injury from any source that human judgment and foresight are capable of providing against, and the master intrusts the performance of the duty responsible for their acts, whether negligent or malicious, and they continue in the line of their employment until their relation with the master is dissolved. The specified duty of the employee in such case may be very limited, but the scope has assumed.' So also, some courts hold that where a master intrusts his servant with a dangerous instrumentality, such as an automobile, for use in his business, and such servant permits another to use it in such business, the master is liable for the negligence of such other in the use thereof," etc. Meacham on Agency, Vol. 1, 2d Ed., sec. 1658, p. 1250. Restatement of the Law (Agency), sec. 485, pp. 1134 and 1135. Burdick's Law of Torts, 4th Ed., "Harms that are not Torts," secs. 84, 85 and 86. 39 C. J., "Master and Servant," sec. 1459, pp. 1271-2; *Perkins v. Coal Co.,* 189 N. C., 602; *Fore v. Geary,* 191 N. C., 90; *Robinson v. Ivey and Company,* 193 N. C., 805 (812); *Booth and Flynn v. Price,* 183 Ark., 975; 76 A. L. R., 957; *Barrier v. Thomas & Howard Co.,* 205 N. C., 425.

Speaking of the duty of the master to the servant, in *Marks v. Cotton Mills,* 135 N. C., 287 (291), is the following: "When any injury to him results from one of the ordinary risks or perils of the service, it is the misfortune of the employee and he must bear the loss, it being *damnum absque injuria;* but the employer must take care that ordinary risks and perils of the employment are not increased by reason of any omission on his part to provide for the safety of his employees. To the extent that he fails in this plain duty, he must answer in damages to his employee for any injuries the latter may sustain which are proximately caused by his negligence."

The general principles of "Emergency Employees" is stated in 76 A. L. R., p. 971, citing authorities: "An emergency within the meaning of the rule must be a sudden and unexpected emergency. . . . If the servant requesting assistance can do the work himself, there is no emergency authorizing him to employ an assistant. . . . It has, however, been held that the bare fact that it is possible to proceed without the services of the person employed is not in itself determinative that there is no necessity for the employment. . . . Whether an emergency exists is ordinarily a question of fact for the jury. . . . While ordinarily the question is for the jury, the court can say whether the evidence is sufficient to support a finding that an emergency existed."

"In *Howard v. Oil Co.,* 174 N. C., 653, it is said: 'It is well recognized that, although the machinery and place of work may be all that is required, liability may, and frequently does, attach by reason of the negligent orders of a foreman, or boss, who stands towards the aggrieved party in the place of vice-principal.'" *Robinson v. Ivey and Co., supra,* p. 812. As to the duty and responsibilities to infants, see *Pettitt v. R. R.,* 186 N. C., 9; *Hoggard v. R. R.,* 194 N. C., 256.

In the present case, we have no factual situation which necessitates the master to warn or instruct the volunteer. The plaintiff was not suddenly exposed to any imminent danger in the unforeseen emergency. He, at the request of the foreman, undertook to carry the hammer in his own way in the performance of, not an unusual, but an ordinary and simple task. We are not dealing with a servant that the foreman had the right to discharge for nonperformance of a duty, and whose command, the servant was called upon to obey. The plaintiff was a volunteer. There seemed to be no unforeseen emergency. The foreman could have taken or pitched the hammer to the workman, or he could have come down for it. The plaintiff testified: "The carpenter on top of the house dropped his hammer and he asked me to get his hammer." Foreman Black "was the one that told me to take it up." It was an 8-foot story, Black said, "Boy, take that hammer up to the carpenter." Plaintiff's brother, Edgar Reaves, testified, "There was not any ladder there to get up on the house at that time, I went up at the corners with braces, climbed up at the corners. . . . That is the way they went up and down. . . . The braces within that space were about 3½ feet apart. There were two braces, you stepped on them and grabbed a joist and pulled yourself up. . . . That's what they were put there for." The window that plaintiff went up was about 15 feet from the way provided. There was nothing that was defective that caused plaintiff to fall. He selected his own way. "I started to climb up through a window and got up in the window and was climbing up to reach a

joist to hand Mr. Armstrong the hammer and I slipped and fell, my hand slipped off the joist." The thing that plaintiff undertook to do was not more dangerous than what any man or a 13-year-old boy is doing daily. The boy rode there on a horse and the climbing to hand the hammer up was perhaps no more dangerous than mounting the horse. The misfortune was that he slipped and fell. It is a matter of common knowledge and to the credit of our people that when called upon to help, the willingness in which they respond. The nature of the work called upon to perform may, in certain cases, entail liability on the foreman and *respondeat superior*. The boy's act was commendable and the accident unfortunate. In law, we cannot hold the defendant liable. In the realm of good morals, how far defendant should have helped repair the injury is beside our jurisdiction. N. C. Code, 1931 (Michie), sec. 5032, is not applicable to the facts in this case. We think the judgment of the court below should be

Affirmed.